(Opinion published 51 N. W. Rep. 918.)

---

HELEN HENDRICKSON *vs.* GREAT NORTHERN RY. Co.

Argued Jan. 15, 1892.   Decided April 7, 1892.

Railway Crossing—Care Required of Ry. Co. at.—A railway company must be exonerated where a collision occurs at the crossing of a public highway between a traveler on the way and one of its trains, when the company has used such reasonable care to avoid the collision as ordinary prudence would suggest.

Same—Proof of Traveler's Care at.—A plaintiff administrator is not required, in all cases, to prove affirmatively that his intestate, who has been killed at the intersection of a public road with a railway, looked or listened for approaching trains.

Same—Traveler's Vigilance Allayed, if Signal Omitted.—When, by reason of an omission or a neglect to sound the whistle or ring the bell of a locomotive as it is approaching a dangerous crossing, the vigilance of a traveler upon the wagon road is allayed, and he is led into a position or

49 245
50 115

49 245
52 341

49 245
58 300

49 245
68 349

49 245
80 401

49 245
81 386
s16LRA 261
52LRA 352
52LRA245n

49 245
82 169

situation in which his life is jeopardized and finally lost, his lack of vigilance cannot be held to amount to culpable or concurring negligence, as a matter of law.

**Evidence Considered.**—Evidence examined, and *held* not to have justified the trial court in directing a verdict for defendant railway company.

Appeal by plaintiff, Helen Hendrickson, from an order of the District Court of Meeker County, *Powers*, J., made September 5, 1891, refusing her motion for a new trial.

Michael Hendrickson was killed about three o'clock in the afternoon of June 30, 1890, at King's Crossing, in Meeker County, on the Great Northern Railway. He was struck by the east coming passenger train while crossing the railway track with team and empty lumber wagon. The plaintiff is his widow. She was on December 17, 1890, appointed administratrix of his estate, and brought this action to recover $10,000 damages for the benefit of herself and his next of kin under 1878 G. S. ch. 77, § 2, as amended by Laws 1889, ch. 109. The negligence charged was failure to blow the whistle or ring the bell on approaching the crossing. The defendant by its answer claimed that the engineer blew the whistle and rang the bell, and that the negligence of the deceased in not listening and looking contributed to the collision. The trial was had June 9, 1891. After the evidence was all given, defendant requested the court to direct the jury to return a verdict for it, on the ground that upon the undisputed facts it appeared that deceased was chargeable with contributory negligence. The court granted the request, and so instructed the jury, and the plaintiff excepted, moved for a new trial, and being denied appealed.

*Francis Bergstrom, F. D. Larrabee,* and *Shaw & Cray,* for appellant.

The jury might conclude from the evidence that the railway company was negligent and did not give a signal of the approach of its train to the crossing. *Loucks* v. *Chicago, M. & St. P. Ry. Co.,* 31 Minn. 526.

Penal Code, § 343, makes it a misdemeanor for an engineer driving a locomotive on any railway to fail to ring the bell or sound the

whistle upon such locomotive at least eighty (80) rods from any place where such railway crosses a traveled road on the same level, or to fail to continue the ringing of such bell or the sounding of such whistle at intervals until such locomotive and the train to which the same is attached shall have completely crossed such road. The traveler upon the highway approaching a railroad crossing has the right to rely upon the engineer's complying with this requirement. A failure upon the part of the engineer to give the signals required by this statute is negligence occurring while acting in the line of his duty, and the railway company is responsible for damages caused thereby.

It was for the jury to determine whether or not Michael Hendrickson was guilty of contributory negligence. *Brown* v. *Milwaukee & St. P. Ry. Co.,* 22 Minn. 165; *Faber* v. *St. Paul, M. & M. Ry. Co.,* 29 Minn. 465; *Loucks* v. *Chicago, M. & St. P. Ry. Co.,* 31 Minn. 526; *Hutchinson* v. *St. Paul, M. & M. Ry. Co.,* 32 Minn. 398; *Beanstrom* v. *Northern Pac. R. Co.,* 46 Minn. 193.

*M. D. Grover, E. A. Campbell,* and *S. L. Campbell,* for respondent.

If this court determines that Hendrickson was guilty of negligence, then it is immaterial whether or not the railway company was guilty of negligence which contributed to the death. The doctrine of comparative negligence of the civil law does not prevail in this state. A railroad is in itself notice and warning of danger, and it is the duty of persons approaching a crossing to look and listen before venturing upon it. *Mynning* v. *Detroit, L. & N. R. Co.,* 59 Mich. 257; *Haas* v. *Grand Rapids & I. R. Co.,* 47 Mich. 401; *Pzolla* v. *Michigan Cent. R. Co.,* 54 Mich. 273; *Rhoades* v. *Chicago & G. T. Ry. Co.,* 58 Mich. 263; *Brown* v. *Milwaukee & St. P. Ry. Co.,* 22 Minn. 165.

Where the driver of a wagon could have prevented the accident by looking or listening for an approaching train, there can be no recovery, notwithstanding the fact that the company was guilty of negligence in not giving the signals. *Gorton* v. *Erie Ry. Co.,* 45 N. Y. 660; *Turner* v. *Hannibal & St. J. Ry. Co.,* 74 Mo. 603; *Marty* v.

*Chicago, St. P., M. & O. Ry. Co.*, 38 Minn. 108; *Weyl* v. *Chicago, M. & St. P. Ry. Co.*, 40 Minn. 350.

COLLINS, J. In this action defendant corporation was charged with having so carelessly and negligently run and operated one of its trains when crossing a public highway as to have brought it in collision with plaintiff's intestate, thereby killing him instantly. The court below ordered and the jury returned a verdict for defendant upon all of the testimony, and plaintiff appeals from an order denying her motion for a new trial. The crossing, which seems to have been an exceedingly dangerous one, known as "King's Crossing," was about midway between the stations of Darwin and Dassel, some six miles apart, on defendant's line of road. The highway was the main traveled road between these places, and along the entire distance ran nearly parallel with the railway, crossing it at the scene of the accident. The deceased had resided for several years some eight miles from this crossing, about five miles from defendant's railway at the nearest point, and it was not made to appear that he knew anything of the specially dangerous character of the place, except as knowledge might be imputed to him from the fact that he had previously driven over the road, twice, according to the testimony of his widow, the plaintiff.

On this particular day he was driving easterly from Darwin to Dassel, having a pair of horses attached to an unloaded lumber wagon. The train, also going easterly, was a regular passenger, upon time, running thirty miles an hour, and due at the crossing about three o'clock P. M. Westerly of the crossing was a deep cut, over a thousand feet long, and, at places, more than twenty-five feet in depth. Beside it, on top of the bank and some forty feet from its edge, was the wagon road, and at various places between the road and the cut were piles of earth and bushes or small trees, which naturally obscured the vision of travelers upon the highway, and rendered it more difficult for them to observe a train approaching from the west. When within less than three hundred feet of the crossing, the wagon road entered upon a slight depression in the surface of the ground, and thence, through a small ravine, down hill, and, bear-

ing northerly, to the railway tracks, which were crossed at an angle of about thirty-five degrees between the cut referred to and another on the east.

The limited opportunity for observing the coming of a train can best be judged by the testimony of the engineer, who, at his post upon the south or right-hand side of the cab, was looking out for the crossing. He saw the horses first, the moment they came in sight, and, an instant after, the wagon, in which Mr. Hendrickson was seated. In his opinion, the locomotive was not over one hundred and twenty feet from the crossing when the team emerged in view at a point on the wagon road not to exceed fifty feet from the rails.

From this testimony it is evident that Mr. Hendrickson, fully aware of the proximity of a railway crossing, as we must presume him to have been, could not have seen, without getting down from his wagon, and did not see, the locomotive before the moment his horses were discovered by the engineer, as before stated, and who instantly realized that they were uncomfortably close to the track over which the train must pass. By reason of the deep cut, the obstructions to the vision before mentioned, the conformation of the ground over which the wagon road descended to within a few feet of the railway, and the angle of the crossing itself, the risk and hazard to wayfarers upon the road were largely augmented.

These facts and circumstances were peculiarly within the knowledge of defendant company, and the engineer in charge of the locomotive admitted, when testifying, that he knew it to be a dangerous crossing.

To sum up the situation, this junction of ways was of such a nature that a person driving on the public road came down a hill in a depression or ravine almost parallel with the track, to a point some fifty feet distant, before he could discover a train coming in his rear, and it would then be but about one hundred and twenty feet away. Running at the rate of the one in question, it would cover that distance (unless checked by the brakes) within three seconds. The imperative necessity for ample cautionary signals by

the trainmen as they approached this place, the vigilance which ought to be exercised by the traveler upon the highway as he came to the track, and the exceedingly dangerous character of such an intersection, need not be enlarged upon.

There was a sharp conflict of testimony as to whether the whistle was sounded at the caution post eighty rods west of the crossing, or whether the bell was then rung, or rung at all until a collision with the wagon seemed imminent. The engineer and fireman, and other persons who were on the train, asserted with great positiveness that the whistle was sounded at the post, and that thereafter the bell was rung as the train approached the crossing. Other persons who resided and were at work in the immediate vicinity, some of whom had reason to observe the approach of the train and to notice the signals, if they had been given, were equally as positive that there was no whistle sounded and no bell rung until the engineer discovered the horses within fifty feet of the track.

On this conflicting testimony it stands conceded that the jurors would have been justified in concluding that no cautionary signal was given, and that the defendant's servants were negligent in this respect when driving their ponderous machinery along the track towards the crossing, a place where every traveler upon the public road is expected to listen for, and therefore has a right to rely to some extent upon, the sounding of a warning or cautionary signal, —a signal to be regulated by and commensurate with the necessities of the locality, the risk and hazard at the intersection. More care and vigilance are required at a crossing of extremely dangerous character, as this was, by all parties, train men and travelers on the highway, than at a place where there are no obstructions to interfere with sight and hearing, the difference between the parties being that the train men are *presumed* to know all about the peculiarities of the intersection, while the travelers on the highway are not *presumed* to have the same knowledge. That they are acquainted with the crossing may be shown, of course.

As there was testimony which would have justified the finding that defendant was negligent, the real question resolves itself into an inquiry whether the proofs conclusively established defendant's

contention that Hendrickson contributed to the negligence which caused his death. This depends wholly upon the testimony of one witness, the only one, aside from the engineer and fireman, who saw the deceased after he came upon defendant's right of way, not far from the point, before mentioned, where he was first discovered by the engineer. This witness was at least thirty rods away, upon the north side of the track, and walking in the direction of the scene of the casualty. He testified that Hendrickson carefully walked his team down the hill, to the point where he could command a view of the track westerly, some fifty feet from the rails, and just at that moment the locomotive emerged in view in the cut about one hundred and fifty feet away, the short, shrill, danger whistles were at once given, the horses became frightened and unmanageable, reared and plunged forward towards the rails, notwithstanding the driver tried to control them, and man, wagon, and team disappeared from his view in the dust and smoke, the crash of the collision coming instantly to his ears. This witness and the engineer and fireman were greatly at variance as to the manner in which the horses were driven towards the crossing, and as to their behavior when the danger signals were given, but these differences were for the jury to pass upon.

We are of the opinion that a case was made which ought to have been submitted to the jury.

Where a railway and a public road intersect, the rights of the traveler and of the railway company are regarded as equal, but, of course, the traveler must yield the right of way to a train drawing near. In other words, if a traveler on a public road, having had an opportunity to learn in any manner of the approach of the railway train, sustains injuries from a collision while attempting to cross the rails when the train is crossing the highway, he has no cause of action. A railway company must be exonerated when a collision occurs at an intersection with a public road, if it has used such reasonable care to avoid the collision as ordinary prudence would suggest. If it has, and a collision ensue, the fault must be with the traveler on the highway, consisting in his failure to exercise ordinary care. In such cases it has been well said that if,

as a matter of common knowledge and experience, the trial court sees, upon the undisputed facts in the case, that the injured traveler was not in the exercise of ordinary care, and that the injury was in part attributable to his want of such care, it will, as he has shown no legal cause of action, dismiss the case or direct a verdict against him.    But the measure of ordinary care is so variable that the question of negligence becomes usually and peculiarly a function for the jury, and the courts can but rarely declare a particular act to be conclusive evidence of negligence.    And that is precisely what was done in this instance, the ruling being the same as if Mr. Hendrickson's view of the railway and the coming train had been wholly unobstructed as he came down the hill towards the crossing.

A plaintiff administrator is not required in all cases of this character to prove affirmatively that his intestate looked or listened. It may be inferred, in view of the circumstances, that the deceased, governed by the instinct of self-preservation, did what a prudent man ordinarily would do to save his life.    See *Pennsylvania R. Co.* v. *Weber*, 76 Pa. St. 157.    It was demonstrated that Hendrickson was in a position or situation extremely perilous to him, and which he had not been cautioned to avoid, if we are to believe plaintiff's witnesses, before he had reached a point in the public road where the train was visible, or when looking for it would have availed.    This situation or position became dangerous, not by the simple act of Mr. Hendrickson in driving there, but through the neglect of defendant's servants to give the warning signals required by law, Pen. Code, § 343, in season to prevent his near approach, and it was made still more perilous by the short, sharp danger whistles made necessary by reason of the neglect before mentioned, blown in such close proximity to the horses as to frighten and cause them to plunge forward upon the tracks directly in front of the destructive force.    As was said in *Pennsylvania R. Co.* v. *Ogier*, 35 Pa. St. 60: "If there was no notice by blowing the whistle, a thing required to be done before reaching the point, and usually done, a traveler accustomed to expect this would not only not be so likely to look out for danger, or be in such preparedness to avoid it, as he otherwise might have been, and this without any culpable negligence on his part; for, if

by the negligence or omission of those in charge of the train his vigilance was allayed, they are not at liberty to impute the consequences of their acts to his want of vigilance, a quality of which they have deprived him."

Assuming, then, as we must, for the jury might have so determined, that no cautionary or warning signals were given, it must be held that if, by reason of this omission or neglect on the part of defendant's servants, Mr. Hendrickson was led to be less vigilant when drawing near to the railway, his view along the tracks being obscured until he reached a place or situation in which his life was jeopardized and finally lost, his want of vigilance cannot be pronounced culpable, or concurring, negligence, as a matter of law. It is not an absolute answer to the claim for redress made by his legal representative that, notwithstanding the alleged omission of cautionary signals by the persons in charge of the locomotive, he might, by the exercise of greater vigilance, have discovered the approaching train, if he had foreseen a violation of the statute, instead of relying, perhaps, on its observance. *Ernst* v. *Hudson River R. Co.*, 35 N. Y. 9.

In respondent's brief, reference has been frequently made to the excellent opportunity there was for observing the line of railway as a person on the public road journeyed easterly from Darwin towards King's crossing. When so journeying, and with a crossing of the track to be made, it would be the duty of the traveler to be watchful, and at all times to exercise ordinary care; but the fact that for two or three miles along the road, and before reaching the point where the view was obstructed, Mr. Hendrickson might have seen the train, had he looked to the rear some distance, was, at most, a simple circumstance to be considered by the jury when considering the claim that he ought to have seen the train in ample time to avoid the collision. While the view for some two or three miles west of the cut was not interfered with, it was greatly obstructed for a distance of more than a thousand feet, just at the point where the opportunities for observation were most needed, and are ordinarily regarded and made useful. Of course, if the train was within range of a traveler's vision, as he looked over or between the piles of earth,

small trees, and other obstructions between the track and the highway, it would be seen, but it would remain unseen and unobserved unless it was at the exact place commanded by a view from that precise point of observation. The view and the presence of the train would have to concur as to time and place.

Nearly all of plaintiff's witnesses, residents of that immediate locality, testified that, although no signals were sounded for the crossing, they heard the train coming from the time it left Darwin station, some three miles west; and from this it is maintained by respondent that had the deceased listened, as was his duty, when he approached the crossing, he, too, would have heard it coming, and would have been warned in ample time to prevent his driving so near the rails. The fact that the swift coming of the train was clearly manifested to the witnesses by the noise it made when running conclusively established, it is argued, that the deceased failed to listen, or, listening, neglected to pay attention to the obvious warning of imminent danger. But in this contention respondent's counsel overlooked two conditions, both present, which might have a bearing upon the matter: *First*, that Mr. Hendrickson was in an empty lumber wagon, which must have made more or less noise as it was driven along; and, *second*, and of more moment, probably, that all of these witnesses were well acquainted with the movements of this particular train, knew when it might be expected at Darwin station, as well as at the crossing, while some of them were paying special attention to its coming on that occasion. A stranger to the neighborhood and to the movements of this train would not be expected to know that a train was approaching King's crossing from the west simply because it whistled and blew off steam at Darwin, or because its approach was apparent to those who knew all about its running time and movements.

Order reversed.

Gilfillan, C. J., absent, sick, did not sit.

(Opinion published 51 N. W. Rep. 1044.)