# MARY KRTINICH v. DULUTH, MISSABE & IRON RANGE RAILWAY COMPANY.[1]

October 20, 1939.

No. 32,065.

*George H. Lommen,* for appellant.

*Dennis F. Donovan, Elmer F. Blu,* and *Clarence J. Hartley,* for respondent.

[1]Reported in 287 N. W. 870.

GALLAGHER, CHIEF JUSTICE.

Appeal from an order granting judgment for defendant notwithstanding the verdict for plaintiff. The order was made on defendant's alternative motion for judgment notwithstanding the verdict or a new trial.

Action was instituted by Mary Krtinich individually and as special administratrix of the estate of George Krtinich, her deceased husband and father of her children, George (age ten), John (age nine), C. (age seven), and Marlene (age four). Defendant answered, denying that it was negligent and alleging contributory negligence and assumption of risk. Upon issues thus joined, the matter came on for hearing before a jury, which returned a verdict for plaintiff in the amount of $7,500. Defendant moved for judgment notwithstanding the verdict or a new trial. Judgment for defendant notwithstanding the verdict was granted. Hence this appeal.

An outline of the facts can be gathered from the undisputed evidence. On August 15, 1937, about noon, George Krtinich, the decedent, Peter Milanovich, Jack Belich, Nick Sertich, and John Starkovich left Hibbing in a 1931 Ford truck owned by Sertich and headed for Eveleth to attend a mass meeting of the Workers Alliance. Seated in the cab were Sertich, the driver, Milanovich, and the deceased, who sat in the middle. Belich and Starkovich sat in the rear. En route to Eveleth, the occupants traveled on highway No. 7, which as it approaches Eveleth curves into a straight stretch of road running in a northerly and southerly direction. About 2,000 feet north of this curve defendant's main line, running east and west, crosses the highway. An area covered by second-growth poplar trees lies west of the highway. This area is bound on the south by an ore dump located near the curve and on the north by a clearance which appears to be the railroad right of way. It was covered with grass about six inches high. A side road runs into No. 7 from the west about 662 feet south of the crossing and is marked with a sign. East of the highway and parallel with it, another railroad track runs toward Eveleth intersecting the main line at a point about 150 feet east of the

crossing. A highway runs from the Troy Location, east of the highway, into No. 7 at a right angle about 287 feet south of the main line. A road sign, 16 inches by 18 inches in diameter and marked "R. R.," is located about 100 feet south of this road and on the east side of the highway. An automatic stop signal set in a frame on the top of which are two intersecting boards marked "Railroad Crossing" is located near and southeast of the crossing. A spur track called the "Spruce spur" curves down from a mine located about six feet above and about 400 feet northwest of the crossing. These tracks cross the highway at the same point as the main line and merge with the latter a short distance east of the crossing. West of the crossing, the main line tracks are at a grade slightly below the surface of the surrounding land.

Mr. Charles Dorway, a civil engineer who made observations for plaintiff, testified that the crossing and the headlight on the crossing signal were visible from the highway as it approached from the south at a distance of about 2,000 feet and that he noted the range of vision to be had at various points on the highway approaching the crossing with the following results: At 662 feet he could see the crossing to the fence (about 50 feet) and the spur track rails; at 400 feet, vision for 250 feet west of the crossing could be had; at 300 feet and 200 feet, the range of vision increased to 380 feet and 570 feet west, respectively. Dorway and several other witnesses testified (and in this respect their testimony is verified by the pictures admitted as evidence) that the spur track descending from the northwest caused the attention of persons approaching the crossing to be distracted from the main line.

As the occupants of the truck drove toward the crossing, defendant's railroad train approached on the main line from the west. When about 200 feet from the crossing, the truck slowed down to 10 to 15 miles an hour. Then, increasing speed, it proceeded toward the tracks. The truck and train collided at the intersection, causing decedent's death.

Appellant argues that (1) defendant was negligent because (a) the statutory warnings and signals required of defendant were

not given; (b) the automatic signal system located near the crossing was not working; (c) the speed of the train was excessive; (d) the defendant could have stopped after discovering that the occupants of the truck were going to proceed across the track; and (2) decedent was not contributorily negligent either as (a) a guest, or (b) one engaged in a joint enterprise.

■ We first consider the extent, if any, to which the jury could reasonably have found defendant negligent. There was evidence which supports the conclusion that statutory warnings and signals required of defendant were not given. A number of witnesses called for plaintiff, including Dellis Prosa and Hugo Hikola, passengers in a car coming from the south on No. 7 when the accident occurred, Charles Beamer, who turned onto the highway from the Troy road shortly before the collision, and John Starkovich—all of whom were in a position to hear the whistles if they had been blown and the bells if they had been rung—testified that they did not hear them. Numerous witnesses testified to the contrary for defendant. We cannot say, as a matter of law, that the jury should have believed the latter. They were justified in concluding that the bells and whistle were silent. See Libaire v. M. & St. L. R. Co. 113 Minn. 517, 130 N. W. 8; Hendrickson v. G. N. Ry. Co. 49 Minn. 245, 51 N. W. 1044, 16 L. R. A. 261, 32 A. S. R. 540; Peterson v. G. N. Ry. Co. 159 Minn. 308, 199 N. W. 3.

Peter Milanovich testified that as the truck approached the crossing the "stop" sign in the frame was parallel with the road. Storer, the engineer on defendant's train, testified that as he approached the crossing from the west on the tracks he saw the sign turn so as to be parallel with the track. No other witnesses observed the situation in this respect at the time of the accident. It is admitted that shortly after the accident when the train was standing on the track with the rear car partly onto the highway the sign was parallel with the road. Witnesses for defendant testified that the train, in stopping, crossed the road and then backed up onto it in order to pick up the injured. Defendant contends that the sign turned parallel with the road when the train went over the crossing and, by reason of the nature of its

mechanism, did not change when the train backed up. The testimony of the two witnesses who observed the sign prior to the accident being opposite, the jury could reasonably have concluded that the sign was not working and that defendant was negligent for that reason. See Woehrle v. Minnesota Transfer Ry. Co. 82 Minn. 165, 84 N. W. 791, 52 L. R. A. 348; Munkel v. C. M. St. P. & P. R. Co. 202 Minn. 264, 278 N. W. 41.

The evidence supports the conclusion that the train was going about 30 miles an hour as it approached the crossing and that at a short distance therefrom it began to drift (coast) up a slight incline so that when it reached the crossing its speed was about 20 to 25 miles an hour. For a combined passenger train such as this one, the speed was, as a matter of law, not excessive. The crossing was rural. Trains approaching from the west were visible for a considerable distance even though it was difficult to see the track itself from No. 7 south of the crossing. Railroads could not possibly meet the demands of the public if such a speed be regarded as excessive under the circumstances. See Hoyum v. D. W. & P. Ry. Co. 203 Minn. 35, 279 N. W. 729.

Appellant's contention that defendant was negligent because the engineer of the train in question failed to stop when it became apparent that the truck was going across is based chiefly on the following testimony of Storer, the engineer, evoked under the fire of cross-examination:

Q. "Mr. Storer, I ask you the question whether or not ordinarily the conditions I have described [the speeding up of the truck] indicate to you that the vehicle is going to stop?

A. "I thought sure they were going to stop.

Q. "Even when you saw them pick up speed?

A. "Yes, sir, I had no idea they were going across. If I had of, I would have stopped.

Q. "You had plenty of time to stop?

A. "I had plenty of time to stop, if I had known they were not going to stop. * * *

Q. "When you saw the speed increase and pick up when it was 75 feet from the crossing, what did that fact indicate to you?

A. "It did not indicate to me that they were going over the crossing."

The engineer had the right to assume that the truck would stop until a collision appeared imminent. Asklund v. C. G. W. R. Co. 176 Minn. 214, 223 N. W. 95. Even assuming that a collision should have appeared imminent to the engineer when the truck was within 75 feet of the crossing, it does not seem reasonably possible for him to have stopped the train so as to avoid the accident. According to the testimony adduced by defendant, the brakes were applied when the engine reached the edge of the crossing. This is not disputed by plaintiff, whose own witnesses testified that the train was over the crossing save for the last car when it stopped. The over-all length of those cars which went over the crossing was in excess of 200 feet. Thus it appears that even if the engineer of defendant's train had applied the brakes when it is assumed that the collision appeared imminent he could not have avoided the accident. His testimony to the effect that he could have stopped must of necessity have referred to what would have been possible if he had known the truck was going across when the train was a considerable distance away from the intersection.

We conclude that the jury could reasonably have found that defendant was negligent in failing to blow whistles or ring bells as it approached the crossing and in failing to have its sign at the crossing in working order. The jury could not reasonably have found defendant negligent in the other respects claimed by appellant.

■ The next question to be determined is: To what extent, if any, was the negligence of defendant a proximate cause of the death of plaintiff's decedent? If the negligence of defendant was not a proximate cause of the death, plaintiff cannot prevail. See Mageau v. G. N. Ry. Co. 102 Minn. 399, 113 N. W. 1016; Truax v. M. St. P. & S. S. M. Ry. Co. 89 Minn. 143, 94 N. W. 440; Palyo v. N. P. Ry. Co. 144 Minn. 398, 175 N. W. 687; Benedict v. C. B. & Q. R. Co. 151 Minn. 149, 186 N. W. 296; Peneff v. D. M. & N. Ry. Co. 164 Minn. 6, 204 N. W. 524; Lind v. G. N. Ry. Co. 171

Minn. 486, 214 N. W. 763; Lundstrom v. Giacamo, 194 Minn. 624, 261 N. W. 465.

The issue under consideration requires examination of the record for evidence concerning the manner in which the accident came about.

There is little dispute respecting the way in which the truck approached and reached the crossing. Peter Milanovich, who was seated in the cab of the truck on the right-hand side, testifying for plaintiff, stated, in effect, that it approached the crossing at a speed of about 25 miles an hour; that at about 200 feet from the crossing the driver of the truck reduced its speed to about ten miles an hour; that he then began to increase the speed; that at about 75 feet from the crossing the deceased shouted, "Train coming"; that the truck was traveling about 20 to 25 miles an hour at that time and that the approaching train was about 200 feet away; that the speed of the truck increased and the speed of the train did not decrease; the collision followed. Jack Belich, seated in the rear of the truck, testified that just before the accident happened he felt the truck slow down to about 15 miles an hour; that it then began to pick up speed and about ten seconds later the collision occurred. John Starkovich, also seated in the rear of the truck, testified to substantially the same effect. For defendant, Guy E. Storer, the engineer of the train in question, testified that as he approached the crossing the train was traveling about 30 miles an hour; that he began to drift (coast) up the slight incline toward the crossing; that when the truck was about 100 to 200 feet from the crossing it began to slow down apparently to stop; that all at once it started up real quickly and started across; that at that time the train and truck were about 75 feet from the crossing; that when he got right to the edge of the crossing he saw that the truck was not going to stop and that he then put on the emergency brake; the collision followed.

From this evidence it appears that the driver of the ill-fated truck either stepped on the accelerator instead of the foot brake when he saw the approaching train or deliberately attempted to beat it to the crossing. His negligence in this respect was the sole

cause of the accident. The failure of defendant to warn of the approaching train was not a proximate cause because the purpose of such warning was realized when the driver saw the train. See Crosby v. G. N. Ry. Co. 187 Minn. 263, 266, 245 N. W. 31. (We must assume he saw it no later than when warned by decedent.) No reason is advanced which would justify the driver of the truck in failing to stop or turn off the road. He had ample time to do either. Instead, knowing of the approaching train, he chose to attempt to beat it to the crossing, or, with no more excuse, stepped on the gas instead of the brake. Under such circumstances, we conclude that the sole cause of the accident was the truck driver's negligence. See Prosser, "The Minnesota Court on Proximate Cause," 21 Minn. L. Rev. 19.

Of the cases cited by appellant, Molden v. M. St. P. & S. S. M. Ry. Co. 160 Minn. 471, 200 N. W. 740, militates most strongly against the decision at which we have thus arrived. In that case the action was to recover for the death of plaintiff's intestate alleged to have been due to the negligence of defendant, causing one of its passenger trains to collide with the automobile in which he was riding, the car being driven by its owner, a brother of the deceased. The place of the fatal collision was where Central avenue in the village of Brooten is crossed by the main track of defendant's railroad. The Molden case is similar, on its facts, to the instant case because in each (1) the evidence was such as to justify a finding that defendant was negligent in failing properly to warn of the approach of the train; (2) the train was visible for a considerable distance from the road on which the vehicle in which decedent was riding was driven; and (3) the deceased warned the driver of the approach of the train. It is distinguishable because there the speed of defendant's train (50 miles an hour through a village) could reasonably have been regarded as negligent by the jury, while the speed of the train in the instant case (about 25 miles an hour in the country) could not be so regarded. The differentiating factor is a vital one, because if the speed of the train involved in our earlier decision had not been excessive the accident would not have happened. The negligence

of defendant in that case continued to be operative until the collision occurred. In the case before us the negligence of defendant (failing to warn of the approach of the train) ceased to be of importance in causing the accident when the driver of the truck, at a time when he could have stopped, saw the train and proceeded to the fatal spot. Therefore, insofar as this court held in the Molden case that defendant's negligence was a proximate cause of the accident, we consider it not applicable to the facts now before us.

The other points raised need not be decided.

Affirmed.